MELVIN J. COLE AND HARRIET L. COLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cole v. Commissioner
Docket No. 9757-84.
United States Tax Court
T.C. Memo 1987-228; 1987 Tax Ct. Memo LEXIS 226; 53 T.C.M. (CCH) 753; T.C.M. (RIA) 87228; May 4, 1987. Ralph Bernstein, for the petitioners. William Merkle, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: SECTION 6651(a) [1]
YEAR
DEFICIENCY
ADDITION TO TAX
1977
$285.00
$0
1979
10,460.00
1,620.00
1980
8,329.00
0
The parties have settled all issues relating to respondent's determination. Petitioners have claimed in their amended petition that they are entitled to a $50,000 deduction *227 which they had not claimed on their 1979 or 1980 tax returns, for a debt that became worthless in 1979 or 1980. Thus, the only issue is whether petitioners are entitled to a $50,000 worthless debt deduction for their 1979 or 1980 taxable years. This case has been submitted under Rule 122. All of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Skokie, Illinois at the time they filed their petition herein. Petitioner Melvin J. Cole ("petitioner") was an attorney during the years at issue. On February 1, 1979, petitioner loaned $50,000 to Borde, Berke, & DeLeonardi, Ltd. ("BB&D"), a professional legal corporation in which petitioner was a 15% shareholder. The loan was evidenced by a note payable on demand after May 1, 1979, with interest at the rate of 13.25%. The note was signed by Howard Borde ("Borde") as president of BB&D. Borde also signed as guarantor. The loan has not been repaid. Interest payments were made on the loan *228 in the amounts and on the dates indicated below: DATE
AMOUNT
May 3, 1979
$1,707.08
July 24, 1980
1,000.00
October 29, 1980
500.00
No other payments were made on the loan. Petitioner has not instituted legal action against either BB&D or Borde. The parties have stipulated that the $50,000 debt is a business debt. Three of BB&D's Federal tax returns, those for the years ended June 30, 1979, 1980, and 1981, and a security agreement with respect to a loan made by the First State Bank of Chicago ("First State Bank") to BB&D in the amount of $125,000 constitute the only evidence of BB&D's financial condition. Each of the three tax returns contain balance sheets, which in condensed form, indicate as follows: Year ended
Year ended
Year ended
June 30, 1979
June 30, 1980
June 30, 1981
Leasehold improvements
furniture & fixtures
270,217
272,965
276,155
Less
depreciation
20,590
249,627
52,943
220,022
85,780
190,375
Other
assets
10,736
40,250
4,437
TOTAL ASSETS
260,363
260,272
194,812
First State Bank liability
[2] 131,145
111,357
88,327
Other liabilities
82,758
113,831
104,786
TOTAL LIABILITIES
213,903
225,188
193,113
*229 The amounts reflected in the balance sheets for BB&D's assets are cost less depreciation deductions. The record contains no indication of the fair market value of such assets. For the taxable year ended June 30, 1979, BB&D claimed that $133,070 of the leasehold improvements, furniture, and fixtures were subject to an investment tax credit ("ITC"). It claimed an ITC in the amount of $13,307. On February 2, 1979, BB&D borrowed $125,000 from First State Bank. BB&D pledged its leasehold, leasehold improvements, furniture, fixtures, accounts receivable, and contract rights to the bank in order to secure payment of the $125,000. Borde, petitioner, and the other shareholders of BB&D each signed a personal guaranty of up to $125,000 to further secure payment of the bank loan. In a subordination agreement, petitioner agreed to subordinate his loan in favor of the bank's loan and First State Bank specifically allowed BB&D to repay the $50,000 to petitioner if BB&D was not in default of the bank loan. [3] There is no indication in the record that *230 BB&D was in default of its bank loan. The parties have stipulated that the balance owing on the bank loan was $2,325 as of January 22, 1986. Section 166(a) allows for a deduction of debts which become wholly or partially worthless during the taxable year. Where a noncorporate taxpayer claims a worthlessness deduction for a "nonbusiness debt," section 166(d) limits the availability of the deduction to the year the debt becomes wholly worthless and characterizes the deduction as a short term capital loss. See 1.166-5(a)(2), Income Tax Regs. The parties have stipulated that the $50,000 debt was a business debt, i.e., a debt other than a nonbusiness debt. Accordingly, section 166(d) has no effect on petitioners. The determination of worthlessness of a debt within a given taxable year depends upon the facts and circumstances of the case. Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. per curiam 310 F. 2d 815 (3d Cir. 1962); Dallmeyer v. Commissioner,14 T.C. 1282, 1291-1292 (1950). *231 This issue must be decided upon a consideration of all the relevant evidence as to the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs.; Riss v. Commissioner,478 F.2d 1160, 1166 (8th Cir. 1973). Proof of worthlessness usually entails the showing of identifiable events which demonstrate the valuelessness of the debt and justify abandonment of any hope of recovery. Crown v. Commissioner,77 T.C. 582, 598 (1981); Riss v. Commissioner,supra.Petitioners bear the burden of proof. Rule 142(a); Crown v. Commissioner, supra at 598. Petitioner instituted no legal action against BB&D as debtor or Borde as guarantor. Petitioner argues that his failure to take legal action was justified because legal action would in all probability not result in satisfaction of a judgment. We agree with petitioner that he is not required to take legal action if such action would be futile. Sec. 1.166-2(b), Income Tax Regs. The issue then is whether legal action against BB&D or Borde would have been futile, in that in all probability such legal action would not result in satisfaction of a judgment. Petitioner argues *232 that a judgment against BB&D would not be satisfied because (1) the leasehold improvements, furniture, and fixtures, the majority of BB&D's assets, "have a minimal value to creditors because of their very nature," (2) all of BB&D's assets are subject to a prior lien, (3) BB&D's net worth dropped from $35,084 to $1,699, and (4) a suit brought by petitioners against BB&D would have triggered a suit by the bank against BB&D as debtor and petitioner as guarantor. The record does not contain a description of BB&D's leasehold improvements, furniture, and fixtures. However, of the $270,217 cost thereof, $133,070 was for tangible personal property as is indicated by a claimed ITC in the amount of $13,307. [4] Petitioner has made no showing that this personal property was not of a nature that could be seized and sold. Considering that the cost of the property was $133,070, realization of $50,000 upon sale thereof does not appear to be improbable. BB&D's leasehold, leasehold improvements, furniture, *233 fixtures, accounts receivable, and contract rights were assigned to the First State Bank and pursuant to the subordination agreement signed by petitioner, First State Bank had first priority on these assets. However, just because all of BB&D's assets were subject to a lien does not mean that a suit by petitioner would have been futile. First, the record does not indicate the value of BB&D's assets. If BB&D's assets were worth, for example, $300,000, even though such assets were subject to a $125,000 lien, sufficient equity in such assets would exist to satisfy a $50,000 judgment. Second, BB&D reduced the balance owed to the bank to $111,357 as of June 30, 1980, and $88,327 as of June 30, 1981 thus increasing, depending on the value of BB&D's assets, the equity from which a $50,000 judgment could be satisfied. As of January 22, 1986, the balance outstanding on the bank loan was only $2,325. Petitioner has failed to prove that the fair market value of BB&D's assets did not exceed First State Bank's lien by an amount sufficient to satisfy a $50,000 judgment. To the extent that net worth is defined as the excess of the cost of assets less depreciation deductions over liabilities, *234 petitioners correctly point out that BB&D's "net worth" dropped from $35,084 on June 30, 1980, to $1,699 on June 30, 1981. However, petitioners fail to point out how this drop in "net worth" is of any relevance to our inquiry. "Net worth" so defined is merely a mathematical difference with little, if any, relationship to the economic value of a business. For "net worth" to properly reflect the economic value of a business, it must be defined as the fair market value of assets over liabilities. The record does not indicate the fair market value of BB&D's assets. The cost less depreciation deductions of the assets recorded on the balance sheets could approximate the fair market value of the assets only in the greatest of coincidences. This is particularly true since the balance sheets do not even list good will and open files, assets which, to a professional legal service business such as BB&D, can be quite valuable. Without evidence of the fair market value of BB&D's assets, the economic value of BB&D as a business is not determinable. Accordingly, there is no indication that the economic value of BB&D as a business dropped during the years in issue. There is no evidence in *235 the record that a suit by petitioners against BB&D would have triggered a suit by the First State Bank against BB&D as debtor and petitioner as guarantor. There is no evidence that BB&D was in default of the $125,000 bank loan. In fact, the declining balance of the amount owed to the bank indicates that BB&D was not in default of the loan. If BB&D was not in default of its bank loan, First State Bank would have no basis or desire to sue BB&D as debtor and petitioner as guarantor. The positions advanced by petitioner do not justify petitioner's failure to institute action against BB&D and do not indicate that the $50,000 debt became worthless in 1979 or 1980. We hold that petitioner has failed to prove that BB&D's $50,000 debt to him became worthless in 1979 or 1980. Having held that petitioner failed to prove the $50,000 debt was worthless vis-a-vis BB&D, we need not determine whether the $50,000 debt was worthless vis-a-vis Borde. Finally, even though petitioner failed to raise the issue, we hold that the evidence does not indicate that the $50,000 debt became even partially worthless during the years in issue. To reflect the foregoing and concessions made by the parties, *236 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The balance due on the First State Bank loan exceeded $125,000 as of June 30, 1979, apparently because of accrued but unpaid interest.↩
3. According to the subordination agreement, petitioner's $125,000 guaranty was limited to only $20,000 until BB&D had repaid petitioner's $50,000 loan.↩
4. There is no indication in the record that the property with respect to which the ITC was claimed was of a type other than that described in section 48(a)(1)(A), "tangible personal property."↩